Filed 10/26/21  In re Victor S. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re VICTOR S., JR. et al., Persons Coming Under the Juvenile Court Law. | B310088 <br><br> (Los Angeles County Super. Ct. No. 20CCJP02743A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> VICTOR S., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Los Angeles County Superior Court, Nichelle L. Blackwell, Juvenile Court Referee.  Affirmed in part and dismissed in part.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

Victor S., the father of now-15-year-old Victor S., Jr., 13-year-old Daisy S., six-year-old Kristopher S. and five-year-old Frank S., appeals from the juvenile court's findings that the children are persons described by Welfare and Institutions Code section 300, subdivisions (b)(1)[1] (as to all children), (c) (as to Victor, Jr.) and (j) (as to Daisy, Kristopher and Frank), and its disposition orders, including orders removing the children from Victor's custody. Victor contends the jurisdiction findings and the removal orders are not supported by substantial evidence.

On June 28, 2021, while Victor's appeal was pending, the juvenile court terminated its jurisdiction and entered a custody order awarding the children's mother, Leticia R., sole legal and physical custody of all four children, limiting Victor to monitored visitation with each of them. Victor has filed a separate appeal from those orders, which is pending in this court.[2]

Termination of dependency jurisdiction moots Victor's appeal of the disposition orders. We affirm the juvenile court's exercise of jurisdiction. (See *In re Rashad D.* (2021) 63 Cal.App.5th 156, 159.)

---

[1] Statutory references are to this code unless otherwise stated.

[2] We take judicial notice of the June 28, 2021 orders and Victor's July 7, 2021 appeal from those orders pursuant to Evidence Code sections 452, subdivision (d), and 459.

2

# FACTUAL AND PROCEDURAL BACKGROUND

1. *The Department's April 2020 Investigation and the Amended Dependency Petition*

The children came to the attention of the Los Angeles County Department of Children and Family Services (Department) on April 9, 2020 when Victor, Jr. told a teacher he intended to kill himself that day. According to the immediate response referral to the Department, the four children were allegedly the victims of emotional abuse by Victor and Leticia, and Victor, Jr. had made suicidal threats in the past, precipitated by the parents' constant fighting and court appearances. Victor was emotionally unstable and would go to the school crying and seeking the school's support for his ongoing custody issues with Leticia.

The Department's reports[3] stated Victor and Leticia were divorced in 2018. Although they shared legal and physical custody of the four children, Victor, Jr. lived with Victor in a hotel room, Daisy lived with Leticia in a three-bedroom house, and the two younger boys were exchanged weekly under a 50/50 family law order. Victor wanted full custody of the children. The parents had continued to appear in family law court following their divorce.

In an April 10, 2020 interview with a Department caseworker conducted at the hospital, Victor, Jr. said he had told his teacher he had "suicidal thoughts" because he had a "big argument with my dad" about whether Victor, Jr. was failing to

---

[3] The Department's reports, including reports containing descriptions of the April 2020 (and other) interviews, were exhibits admitted without objection by the parties at the December 18, 2020 jurisdiction/disposition hearing.

log onto the school website and sign into school (a required part of the COVID-19 remote learning protocol). Victor, Jr. had become stressed at his father's lack of trust and disappointment in him and had "an automatic thought of hanging myself or jumping off the balcony." Victor had received a call from the school's principal, and it was agreed Victor, Jr. should be taken to the emergency room. Victor, Jr. had arrived at the hospital on April 9, 2020.

Although Victor, Jr. denied his father had called him names or denigrated him, Victor, Jr. told the caseworker he wanted his father to work on the manner in which Victor spoke to him. His father would say things "in the wrong way because he does not know how to explain it."

At times, Victor would incite an argument with Victor, Jr. or Victor, Jr.'s siblings. Although Victor, Jr. would often become annoyed when arguing with his father, he only had suicidal thoughts if they had a big argument. Victor, Jr. had visions of how he would hurt himself. At one time, he reported, he "looked in the room" and "had a vision I would be hanged in the room." He said he was diagnosed with depression and anxiety and received therapy once a week.

Victor, Jr. explained he had been living with his father for three years. His mother frustrated his father, and there was animosity when his parents interacted. His mother made false allegations against his father; and, because his mother was a liar, Victor, Jr. did not communicate with his mother in person or by telephone. He did not want to live with his mother because he had lost his trust in her.

In a follow-up interview on April 16, 2020 Victor, Jr., asked by the caseworker if he had heard his father's conversations with

4

his mother since returning from the hospital, replied he had heard Victor because his father talked while in the hotel room kitchen.[4]  It caused him stress when he heard his father reply to his mother, but not to the point of wanting to hurt himself.

The Department interviewed Kristopher on April 16, 2020 at Victor's home in the presence of Victor's neighbor.  Kristopher had a difficult time focusing and answering the caseworker's questions.  When the caseworker asked Kristopher what happened when he got into trouble, he said "Jr." (Victor, Jr.) hit him, but then nodded his head up and down and said yes after the caseworker asked if his father hit him.  When asked where he was hit and to point to those places, Kristopher said he was hit everywhere and pointed to his head, arms and legs.  He also said his father pulled his ear.  Kristopher told the caseworker he was scared of his father.  Although in an earlier interview he had denied witnessing his parents fighting or arguing, Kristopher subsequently responded in the affirmative when asked if he had ever seen his parents fight and said he was afraid when they did.  Kristopher said, "I don't want to be here," but did not respond when asked why.  The caseworker observed a left scrape on Kristopher's shin, scars on his knees and a bruise on his right knee; Kristopher told the caseworker he did not know how he got the bruises.

Frank was also interviewed on April 16, 2020 in the presence of Victor's neighbor.  He, too, had difficulty focusing and answering the caseworker's questions.  When the caseworker asked Frank what happened when he got into trouble, Frank said

---

[4]     Victor's hotel room home, which was on the third floor, had two queen beds, a small kitchen, an electric stove, table and chairs, a television and a separate bathroom.

his father hit him. Asked where he was hit, Frank replied, "[E]verywhere" and, in response to a follow-up inquiry, pointed to different parts of his body, including his head, arms and legs, and then pulled on his ear. He said he was scared of his father. When asked if he would like to be with his father, Frank said he wanted to be with his mother. The caseworker observed a scrape on Frank's knee; Frank said he hurt himself there.

Daisy was interviewed on April 16, 2020 at her mother's home. She was free from marks or bruises. Daisy said her mother disciplined her by taking away her phone. Victor would just "scream" and sometimes tell her to go with her mother if she did not want to be with him. She never saw her mother drink alcohol, but, in the past, she saw her father drink beer sometimes. Daisy did not know what happened with Victor, Jr. because she had not been to her father's home. She had not visited her father since 2019.

Daisy was aware her parents were having problems because she would see her mother text and become frustrated or cry. Daisy said Victor had "done a lot of things to hurt" Leticia. She heard her father call Leticia "the B word" and told the children "stuff about my mom that made us believe she is a bad person." Daisy said, "[T]here's been parts when I don't know what to do because of my dad, sometimes I wish I didn't have him as a father, I wish I wasn't here, he's trying to make my life worse." Victor had been rude toward her and forced her to visit his home. Although she denied feeling suicidal, she said she was diagnosed with depression but was not taking medication. She felt safe in her mother's home.

The Department interviewed Victor in April 2020. He said he was diagnosed with anxiety and depression, had been

receiving mental health services since at least 2019 and took psychotropic medication. Victor acknowledged his criminal history, which included an arrest for selling methamphetamine, but denied any substance use or abuse. Although he admitted having had problems with alcohol in the past, he claimed he had been sober for two years. Victor declined the caseworker's request he submit to a drug test. Victor admitted there had been verbal abuse between Leticia and him.

Victor reported that Victor, Jr. was autistic and said he was working on getting Kristopher diagnosed. Victor, Jr. had been in therapy for three years.

As for the concern regarding Victor, Jr.'s possible self-harm, Victor told the caseworker he was in the room with Victor, Jr., but stepped out to receive a call from Victor, Jr.'s teacher, who informed him of Victor, Jr.'s statement. Victor ran back to the hotel room. Victor, Jr. had the hotel door open and was looking beyond the balcony. Victor stopped Victor, Jr. from hurting himself. According to Victor, he had confronted Victor, Jr. about the log-in issue after learning of the matter from Leticia. Victor was upset the school had notified Leticia, not him. Although denying having been verbally abusive to his son, Victor admitted he had been upset. He also said he had not needed Leticia "to nail me."

Asked if he was aware of how his relationship with Leticia was affecting the children, Victor explained he and Leticia no longer speak to each other via telephone and only communicate by texting; however, he admitted he did not know how to write and thus spoke on his phone to create texts to Leticia. Although he would try to speak to Leticia outside his hotel room, where Victor, Jr. would be unable to hear him, he admitted he

7

sometimes replied to Leticia while in the same room as his son. During the interview Victor became visibly agitated and interrupted the caseworker multiple times; he told the caseworker he becomes upset when speaking of Leticia.

Victor denied using physical discipline, pulling his children's ears or hitting them. He said the children always had bruises that their mother could not explain.

The Department in April 2020 interviewed Maria,[5] a friend of Victor who was also one of Victor, Jr.'s therapists. Maria knew the family and told the caseworker Victor did not realize what he said affected the children. She said Victor got "worked up very easily" and did "not know how to express himself."

The Department in April 2020 interviewed another of Victor, Jr.'s therapists, Christopher Richardson, who told the caseworker Victor, Jr. was diagnosed with depression and had previously discussed suicidal ideation. Victor, Jr. had experienced feelings of being emotionally overwhelmed by his parents' conflict; and, since the COVID-19 stay-at-home orders began, he felt extremely overwhelmed and emotional. Richardson had suggested the parents communicate only via text to minimize their conflict.

During her April 2020 interview with the Department, Leticia said Victor, Jr. had been diagnosed with depression after she and Victor divorced. She denied allegations of emotional abuse of Victor, Jr.

The Department filed a dependency petition on the children's behalf on May 19, 2020, which was later amended by

---

[5]     The record does not contain information as to therapist Maria's last name.

interlineation.[6]  In the amended petition the Department alleged, pursuant to section 300, subdivisions (b)(1) (for all four children) and (j) (for Daisy, Kristopher and Frank), Victor had a limited ability to provide Victor, Jr. with ongoing care and supervision due to the child's mental and emotional problems, and that limited ability endangered Victor, Jr.'s physical and emotional health and safety and placed the child's three siblings at risk of serious physical and emotional harm.  The Department further alleged pursuant to section 300, subdivision (c) (for Victor, Jr.), that Leticia and Victor were engaged in an ongoing custody dispute that placed the child at substantial risk of suffering serious emotional harm; the parents had engaged in verbal altercations in the child's presence; the mother had made false allegations against the father, resulting in the child refusing to return to the mother's home; the child had a diagnosis of depression and anxiety, had demonstrated suicidal ideations and had expressed being emotionally overwhelmed due to the ongoing conflict between the parents; and that conflict between the parents, and the father's emotional abuse of the child, placed the child at substantial risk of suffering serious emotional damage, as evidenced by severe anxiety, depression, withdrawal, and aggressive behavior toward himself or others.

---

[6]    The initial petition had named both Victor and Leticia as offending parents for purposes of jurisdiction under section 300, subdivisions (b)(1) and (j), but on December 18, 2020 the juvenile court ordered it amended by interlineation by removing references to Leticia from the subdivisions (b)(1) and (j) factual allegations.

2. *The Jurisdiction/Disposition Report and Reports Filed in October and November 2020*

The Department's jurisdiction/disposition report filed July 29, 2020 described additional interviews. In a June 23, 2020 interview at home in his father's hotel room, Victor, Jr. was initially observed displaying a normal affect but became tearful as the caseworker discussed his parents and mental health. His weekly therapy was going "fine," and his father gave him his medication daily. He wanted to continue to stay with his father, who supported his interest in animation, introduced him to new people like the daughter of a hotel maid and tried to keep him away from gang life. Victor, Jr. told the caseworker that, although he felt safe, he also worried a lot, "[e]ven when I'm trying to rest"; "I think what if someone dies or what if I die." Without prompting, Victor, Jr. asked the caseworker, "[W]hy do my parents have to fight about why they (Kristopher and Frank) have a bruise and court cases?" Victor, Jr. disclosed an incident in which he and his father had an argument started by his father's anger at his mother. Victor, Jr. had punched his father, and Victor had punched him back on the lip.

The caseworker on June 23, 2020 spoke to both Kristopher and Frank. Kristopher said his parents did not hit each other but they yelled when they talked to each other and he would get scared and hide when they did. Frank said his father hated his mother. Although he liked being with both parents, it scared him when his parents fought; he would hide somewhere when they did and not come out. He said he would like his family to "not do bad things."

Daisy, who was interviewed on June 25, 2020 at her mother's home, told the caseworker she did not believe Victor had

the ability to provide appropriate care for Victor, Jr. Victor was going through therapy, and Daisy did not believe he was strong enough to deal with his and Victor, Jr.'s problems. Victor and Victor, Jr. would get into fights, and no one was there to stop them. Daisy was like their therapist when she had stayed with her father. Victor had a tendency to exaggerate and frequently made inappropriate statements. When Victor, Jr. expressed his dislike of a word her father used, Victor would nevertheless continue saying it. Her father's jokes about Victor, Jr.'s animals hurt her older brother, and Victor needed to know to stop. "My dad threatens to send Jr. to the hospital a bunch of times." She did, however, acknowledge one time, when Victor, Jr. was depressed and wanted to kill himself, her father told Daisy to give her older brother a hug and not to make jokes or get on her brother's nerves.

Asked why she was not visiting Victor, Daisy replied, "[A] lot has happened between him and me and I haven't trusted him for a while." One time, Victor showed Daisy, Kristopher and Frank a gun in the car. He told them he was "going to kill people," their mother's friend and the maternal family. He said Daisy "had to choose who to kill." Victor would also "make[ ] up stuff," such as telling Daisy her mother had a secret boyfriend and had a child with him. In addition, her father would threaten to have Leticia deported and to take Daisy away from the home she shared with her mother and maternal grandmother. He "threatens to call the cops on us for dumb reasons." Daisy explained she wanted to get her mental health in good condition and to trust her father again before she would be comfortable visiting him. Asked if she had ever witnessed Victor, Jr. try to hurt himself, Daisy recalled an incident when he grabbed a knife

11

and said he wanted to kill himself. She said it hurts her when he does that.

Leticia, interviewed in June 2020, told the caseworker she missed Victor, Jr., who did not want to see her. Victor used Victor, Jr. to punish or reward her. Leticia affirmed that the children had seen the parents argue and had been upset. She explained she was the quiet one, so she let Victor do the talking. Victor would call her names like "fuckin slut" while holding Frank. She did not "go back and forth" with him because the children were present and she did not enjoy arguing. Communicating with Victor continued to be difficult. Asked if there was physical violence between her and Victor, Leticia responded, "[P]hysical not often; mostly emotional." Victor, smelling of alcohol, had punched her in the lip when she had been pregnant with Victor, Jr. In another instance he had spent the entire day without her at their apartment drinking with people. When she returned to their apartment in the evening and saw beer bottles everywhere, an argument ensued. She wanted to leave, but he pushed her, and she fell to the floor.

Victor was interviewed in June 2020. He agreed he and Leticia were unable to get along and acknowledged they had verbal altercations in their children's presence. He said, as part of Victor, Jr.'s autism, Victor, Jr. did not like change or lies. The day Leticia had texted Victor about Victor, Jr. not doing his school assignments, Victor asked him why he was lying, and Victor, Jr. thought Victor was picking Leticia's side. Victor, Jr. in the past had choked his maternal grandmother because he had been angry. Victor, Jr. had felt his mother and maternal grandmother had lied to him.

Victor also said he had been taking care of Victor, Jr. for three years and denied he was unable to provide ongoing care for the child. He provided Victor, Jr. access to resources like therapy, mental health services and tutoring; encouraged his son to be social with other children at the hotel; bought a guinea pig to provide his son mental support; purchased animation supplies for his son; taught Victor, Jr. how to use a pen rather than his fingers for his tablet to improve motor skills; and ensured his son regularly maintained his hygiene routine. Although he had been aware of Victor, Jr.'s history of suicidal thoughts, his son had not acted on those thoughts until the April 9, 2020 incident.

Victor acknowledged he and Leticia were engaged in an ongoing custody dispute. He stated he wanted full custody of the children because he wanted to prove his ability to take care of them as their father and remove them from the environment in which he had grown up.

In assessing the children's safety risks the caseworker stated the parents had demonstrated no improvement in their communication, and their lack of insight regarding their built-up animosity interfered with their ability to have a healthy co-parenting relationship with their children. As an example, Victor and Leticia demonstrated an inability to discuss a bruise or mark on a child while in one parent's care without the other parent challenging the parent's ability to take care of the children.

The jurisdiction/disposition report also described Victor's history of drug and alcohol use. Victor began "drinking hard" at age 17, consuming alcohol nearly every day. He continued drinking heavily as an adult when he fell into a depression and was "looking for an excuse to be numb." He claimed he had since,

on his own, stopped drinking alcohol.  Victor also had used methamphetamine and cocaine every day between the ages of 16 and 18 but stopped using drugs after he was arrested while in possession of methamphetamine.  In addition to his psychotropic medications as part of his mental health services treatment, Victor took multiple medications for other health problems, including a back injury.  His doctor used to prescribe him codeine but stopped after he began abusing it.

Although the juvenile court on May 22, 2020 ordered the Department to refer Victor for random drug testing, Victor failed to appear for testing on three occasions:  May 27, June 5, and June 25, 2020.  Victor on June 11, 2020 provided excuses for his failure to test, such as misplacing the instructions, but a little over a week later on June 19, 2020 claimed he had been showing up for testing.

The Department filed a supplemental report on October 29, 2020, which described interactions between Victor and Irma Orea, one of the Department's caseworkers.  In September 2020 Leticia, Daisy, Kristopher and Frank tested positive for COVID-19.  Victor refused to allow Leticia to pick up Kristopher and Frank, and Orea informed Leticia she could request police assistance because Victor was required to adhere to the court's visitation orders.  Victor accused Orea of siding with Leticia, refused to speak to Orea and requested a new caseworker.

On October 21, 2020 Orea spoke with Leticia's therapist and parenting instructor, who said Leticia, one of the most active participants he had, was very receptive in her parenting classes and therapy sessions, but Victor resisted and appeared not to do his part.  Although Leticia's sense of self-worth had improved and she had made advances in her ability to assert herself, she

14

continued to be manipulated by Victor. It was difficult for Leticia to establish healthy boundaries with Victor because he made her feel guilty. Victor tended to manipulate the children and attempted to sabotage Leticia's relationship with them.

Victor continued to fail to submit to random drug testing despite the juvenile court's order. For the period July 8, 2020 to September 24, 2020, Victor had six "No Show[s]." When Orea asked why he had not submitted to testing, Victor said he had car trouble. When she offered him a bus pass, he declined on the ground his back issues hindered his ability to take public transportation. When she offered to transport him on test dates, he failed to call her. When another caseworker contacted Victor, he said he had received Orea's calls but refused to call her back because he was upset with Orea and wanted a new caseworker.

A last minute information report filed by the Department on November 5, 2020 explained a team of five Department caseworkers assigned to the case met and identified their concerns that Victor's mental health was affecting his ability to function. Victor struggled when a few tasks were scheduled in one day, such as the children logging in to school on time for virtual education when other appointments (medical, therapy, caseworker visit) were scheduled the same day. He was unable to follow through when asked to complete tasks. He made inappropriate jokes and was cynical and often impulsive in making statements in the children's presence. Victor continued to make inappropriate comments to Victor, Jr., who was experiencing his own mental health issues. Because of Victor's past drug abuse, the caseworkers were concerned about Victor's failure to submit to drug testing despite the court's order. He continued to maintain inappropriate boundaries with Leticia and

had become more resistant toward the Department. The Department recommended an evaluation of Victor for mental illnesses, psychotic disorders and personality disorders preventing him from effectively engaging in treatment.

### 3. *The Department's Application To Detain the Children*

On November 6, 2020 the Department applied for an order to detain the children from Victor's custody based on ongoing concerns related to Victor's emotional stability and his relationship dynamics with Leticia and the children, as well as Victor, Jr.'s mental health issues.[7] As set forth in the application, a caseworker on November 4, 2020 received a telephone call from Isela Barales, a case manager from The Whole Child agency, which had been providing Victor housing assistance and had secured coverage of his housing costs for the past six months. Barales had received a text message late at night from Victor, falsely accusing her of having provided a letter to the Department to remove the children from his custody and threatening to expose her on the local television news. Barales told Victor she had not sent any letter to the Department. Barales told the caseworker she had received other disturbing text messages from Victor accusing her of having contacted the Department regarding its investigation of his case and Victor in the past had been informed that the agency would be unable to work with him if he continued to make threats or behave in a

---

[7] The application, signed by two Department caseworkers under penalty of perjury, was among the exhibits the juvenile court admitted without objection at the December 18, 2020 jurisdiction/disposition hearing.

hostile manner. Barales suspected Victor was using drugs in part because of his erratic behavior, and Victor's prior agency case manager had also suspected Victor's drug use when working with him.

The Department's caseworker called Victor on November 6, 2020, informed him she had been told of his possible drug use, and requested he submit to drug testing the following day, a Saturday. Victor said he was unavailable because he was celebrating Kristopher's birthday. When informed of the site's hours, which the caseworker explained should provide sufficient time to test, Victor replied he would be out of town. He eventually agreed to test on Tuesday, November 10, 2020, after stating he had a court hearing and a therapy session on Monday, November 9.

Victor, Jr. in September 2020 had another mental health crisis when he threatened again to jump off the balcony of Victor's hotel room. On September 17, 2020 Orea made an unannounced visit to Victor's home when she learned of the crisis. Orea arrived at 9:00 a.m. and found the children still asleep and not logged into school. Victor, displeased about the unannounced visit, accused Orea of violating his rights. Victor stated the children would not be attending school remotely that day because he was waiting for another caseworker's call regarding transporting him and the children for a forensic examination. Orea spoke to Victor about stating, "I don't care if you jump off the balcony" to Victor, Jr. during his crisis. Victor said he made the statement "I don't care if he jumps" to Leticia, not directly to Victor, Jr., because he was frustrated with Leticia and the Department. He denied wanting his son to jump off the balcony. Victor, Jr. denied having suicidal thoughts.

The Department continued to be concerned about Victor's mental health. He appeared to provoke Victor, Jr. and endanger the child's mental health, the Department believed, due at least in part to Victor's own inability to manage his emotions. Since the Department's initial petition had been filed, the Department had been unable to obtain any information regarding Victor's progress in his mental health services treatment. Victor's therapist had informed the Department Victor had refused to consent to the disclosure of his diagnosis or his progress in therapy.

At the November 9, 2020 hearing on the Department's application, with all parties' (including Victor's) counsel present, the juvenile court ordered the children detained from Victor and placed with Leticia. Victor was granted monitored visits with the children.

4. *The December 2020 Last Minute Information Reports and the Restraining Orders*

The Department's last minute information report filed on December 2, 2020 described a series of incidents that, at least in part, led to the juvenile court's granting a temporary restraining order on November 12, 2020 to protect Orea from Victor. Among those events, on November 9, 2020, shortly after the juvenile court ordered the children's detention, Victor's mental health therapist and a supervisor from the mental health clinic called Orea, Orea's supervisor Alexandra Encinas, and other caseworkers to warn that Victor had threatened to harm all social workers going to his home and informing the Department that they would be filing a police report. Because of Victor's threat, two additional Department employees, tasked with removing the children from Victor's custody, went to Victor's

18

home accompanied by law enforcement officers and found no one home. Matthew Figueroa, one of the two employees, later met Victor at a Department office parking lot. Victor came out of his car, raising his voice and cursing at Figueroa for bringing a security guard and another person. Victor's three sons came out of Victor's car. Victor continued to curse at Figueroa in the children's presence.

Victor, Jr. said he was aware of the court order and comfortable going with Leticia, who picked up her sons but realized she did not have Victor, Jr.'s medication. Encinas met Victor at a gas station mini-mart to retrieve it. Victor was argumentative, and his aggressive body language intimidated Encinas. While Victor, who refused to end the conversation, argued for 30 minutes, a man pumping gas gestured toward Encinas as if to ask if she was alright. Another group of people appeared to intentionally walk between her and Victor to create space between them. Encinas maintained her distance. The meeting ended after a gas station employee asked Encinas, "Are you ok?" and, assured with Encinas's affirmative reply, requested they leave. Victor told Encinas he was planning on turning off his phone for the next few days and did not intend to submit to drug testing the following day. He ignored Encinas's encouragement to follow the court's orders, walked into the mini-mart, purchased a pack of beer and carried the beer to his car. Victor failed on November 10, 2020 and November 19, 2020 to submit to drug testing. On December 3, 2020 the juvenile court

issued a permanent restraining order protecting Orea for a period of three years from Victor.[8]

The Department's last minute information report filed on December 16, 2020 described Victor's December 15, 2020 monitored visit with the children at a park. Prior to Victor's arrival, the caseworker reminded Victor of the court-ordered requirement that he not discuss the case with the children or make disparaging comments about Leticia. Victor came, greeted his sons and ignored Daisy's effort to greet him. Victor, Jr. told his father that one of his pet guinea pigs had died. Victor became hysterical and began shouting, "[A]nd your mother didn't do anything to help did she?" When Victor, Jr. defended his mother, explaining Leticia had tried to help and they had visited three different veterinarians, Victor insisted the guinea pig's death was Leticia's fault because it had died of stress caused by the children's removal from Victor's care.

Victor was on the phone for 20 minutes during the hour-long visit. He audibly complained about the case on the phone. He ignored the caseworker's warnings to end his disruptive behavior. While Victor was on the phone, Daisy, uncomfortable with Victor's dismissive behavior toward her, stayed close to the caseworker. After ending his phone conversation, Victor, appearing angry, headed toward the caseworker, who asked Victor to keep his distance. Victor demanded, "[W]hy are you coming at me like that?" When asked by the caseworker why he thought the caseworker was "coming at" him, Victor referred to the caseworker's staring at him while he was on the phone. The

---

[8] At the jurisdiction/disposition hearing, the juvenile court took judicial notice of all of its prior findings and orders in the case.

caseworker explained the inappropriateness of phone calls during visitation. Victor complained about Orea, Encinas and his own attorney and insisted no restraining order existed. When the caseworker reminded him the court had read the details of the restraining order at a hearing, Victor said, "[Y]ou can tell the judge she can kiss my ass!" "[A]ll those attorneys are lucky I didn't lash out at them because I'll let them have it."[9] After the caseworker suggested they speak about case matters at another time, Victor continued to focus on his phone. After the caseworker suggested Victor spend the rest of the visitation time with his children, Victor stated, "I'm done with my time."

When the caseworker asked Victor why he had not acknowledged or spoken to Daisy throughout the visit, Victor stated they "ha[d] issues." The caseworker explained that Daisy had been reluctant to come and built up her courage to do so. Victor became upset and began shouting to Daisy to approach him. As she did, Victor started yelling, accusing the child of making false statements about him. Daisy, agitated, shouted back that she had done nothing wrong. Victor continued to shout at Daisy until the caseworker asked him to stop. The caseworker instructed Daisy, who was highly emotional and upset, to wait by a tree in the distance for the caseworker and the rest of the

[9]     In complaining to the caseworker during the December 15, 2020 visit, Victor also claimed Victor, Jr. had failed to log in to school since being placed with Leticia and, as supposed proof, gave the caseworker a document from the school district listing 19 dates in the two-month period from September 3 to November 9. The caseworker reminded Victor the dates corresponded to the times the child was in his care. In fact, the record shows Leticia had to go to Victor's home to ensure the children logged into school while in his care.

children to end the visit. Following this incident Daisy did not want to continue visiting with Victor.

5. *The Jurisdiction and Disposition Hearing*

At the jurisdiction and disposition hearing on December 18, 2020, after hearing the arguments of counsel, the juvenile court sustained the amended petition, finding the Department had carried its burden as to the amended petition's allegations of jurisdiction under section 300, subdivisions (b)(1), (c) and (j).

As for disposition, the court removed the children from Victor's custody, placed them with Leticia and ordered family maintenance services. The court ordered Victor to participate in enhancement services that included a full drug and alcohol program with aftercare, random weekly drug or alcohol testing, a 12-step program, parenting classes, individual counseling and mental health counseling, with requirements to submit to a psychiatric evaluation and take prescribed psychotropic medications. Observing Victor's failure to show up for any drug or alcohol testing, the court stated it considered the missed tests to be positive.

The court ordered Victor's visitation with Daisy suspended "unless and until the therapist provides information to this court to indicate that it is appropriate." Visitation with his three sons was to be monitored for nine hours per week.

## DISCUSSION

1. *Substantial Evidence Supports the Juvenile Court's Jurisdiction Findings*

a. *Standard of review*

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we

22

determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; see *In re I.C.* (2018) 4 Cal.5th 869, 892.) We review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could find that the order is appropriate. (*In re I.J.*, at p. 773; accord, *In re I.C.*, at p. 892.)

b. *Subdivisions (b) and (j) jurisdiction*

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2; see *In re A.F.* (2016) 3 Cal.App.5th 283, 289; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.)

Section 300, subdivision (b)(1), allows a child to be adjudged a dependent of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the

23

child from the conduct of a custodian with whom the child has been left." A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; see *In re R.T.* (2017) 3 Cal.5th 622, 624 ["section 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child"].)

Section 300, subdivision (j), authorizes dependency jurisdiction when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." In considering the applicability of subdivision (j), the Legislature directed the juvenile court to "consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).) "'The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the [enumerated] subdivisions. . . . The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling

has been found to have been abused than the court would have in the absence of that circumstance.'" (*In re I.J., supra,* 56 Cal.4th at p. 774.)

Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re J.N.* (2021) 62 Cal.App.5th 767, 775; *In re D.L.* (2018) 22 Cal.App.5th 1142, 1146), the juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383; *In re N.M.* (2011) 197 Cal.App.4th 159, 165.) The court must evaluate the future risks facing a child and may consider past events in deciding whether a child currently needs the court's protection. (*In re J.N.*, at p. 775; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216; *In re N.M.*, at p. 165.) A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.*(2002) 103 Cal.App.4th 453, 461; accord, *In re Kadence P.*, at p. 1384.)

Substantial evidence supports the juvenile court's jurisdiction findings for Victor, Jr. under section 300, subdivision (b)(1), and for Daisy, Kristopher and Frank under section 300, subdivisions (b)(1) and (j). Victor had a limited ability to provide Victor, Jr. with ongoing care and supervision due to the child's mental and emotional problems, and that limited ability endangered Victor, Jr.'s physical health and safety and placed the child's three siblings at risk of serious physical harm.

Victor, Jr. was diagnosed with depression and anxiety; required therapy and medication for his depression; had a history of suicidal ideations; had taken steps to act on those thoughts of

suicide, including grabbing a knife in one instance and, in another, stepping out of the hotel room to peer over the balcony after he had declared his desire to jump; and had been hospitalized for suicidal thoughts less than a year before the December 2020 jurisdiction and disposition hearing. He had been diagnosed with depression after his parents' divorce. His parents' conflict had caused him to feel emotionally overwhelmed, and he admitted having suicidal thoughts if he had a significant argument with his father. According to Victor, Jr.'s therapist, when the child has explosive arguments, "thoughts might come in."

For his part, Victor was diagnosed with anxiety and depression, received mental health services requiring medication, had a history of substance abuse and, more recently, failed to submit to any of multiple court-ordered random drug or alcohol testing. There was ample evidence that Victor had an impaired capacity to appropriately manage his emotions and temper his behavior, which limited his ability to provide the ongoing care and supervision required in light of Victor, Jr.'s mental and emotional needs. As we summarized, the record is replete with evidence of Victor's inability to control or otherwise modulate his emotional responses in an appropriate fashion as necessary to protect Victor, Jr. from an emotional state leading to suicidal thoughts.

The record also demonstrated that Victor lacked insight regarding the effect on his children of his ongoing rancorous verbal altercations with Leticia in the children's presence, even though such conflict emotionally destabilized Victor, Jr. Even Frank, at the time only four years old, told the Department his father hated his mother. Victor continued to speak on the

telephone to Leticia within earshot of Victor, Jr. after the child's therapist Richardson had recommended the parents communicate in a manner that minimized the effect of their conflict. As recently as three days before the jurisdiction and disposition hearing, during the December 15, 2020 monitored visit, Victor, informed that one of Victor, Jr.'s emotional support pets had died, became hysterical. In violation of an existing court order not to disparage Leticia and despite the child's fragile mental and emotional health, Victor, shouting at Victor, Jr., blamed the child's mother for the pet's death.

Victor points to evidence, with respect to the April 9, 2020 referral incident, minimizing his responsibility for Victor, Jr.'s suicidal thoughts that day, including Victor, Jr.'s explanation the suicidal ideation arose from becoming stressed at Victor's lack of trust and disappointment in the child for failure to check in for school. However, Victor admitted he had been upset at the time that it was Leticia who had been notified of their son's failure to check in online for school. Although Victor may not have been physically aggressive with, or verbally abusive to, his son, the juvenile court could nevertheless have reasonably inferred that Victor had expressed his anger about Leticia when confronting his son, contributing to the child's distraught emotional state and suicidal ideations.

Victor argues he was able to provide ongoing care and supervision by referring to (among other matters) evidence indicating he ensured Victor, Jr. received weekly therapy and medication, linked his son with therapeutic and tutoring resources, supported his son's animation interests, encouraged his son to be appropriately social and bought his son's emotional support animal. This evidence, however, does not disprove that

27

Victor had an impaired capacity to appropriately manage his emotional responses and moderate his behavior. Nor does it disprove that Victor was unable to provide the care and supervision required in light of Victor, Jr.'s mental and emotional needs by providing an environment of sufficient stability to prevent serious physical harm. In any event, Victor's argument essentially invites us to reweigh the evidence, a task outside the proper scope of appellate review. (See, e.g., *In re I.J.*, *supra*, 56 Cal.4th at p. 773 ["""[w]e do not reweigh the evidence"""]; *In re S.R.* (2020) 48 Cal.App.5th 204, 219 [same].)

As for Daisy, Kristopher and Frank, Victor contends insufficient evidence supported the jurisdiction findings as to them because they are not similarly situated to Victor, Jr. Specifically, Victor contends Victor, Jr. was autistic[10] and diagnosed with depression and anxiety and lived primarily with Victor, while his siblings lived primarily with Leticia. In addition, he argues, Kristopher denied ever witnessing the parents fighting or arguing; Daisy never observed the parents physically fighting (as opposed to verbally arguing); and Daisy said she and Victor, Jr. would just be annoyed when the parents argued.

Nothing in the record, including interviews with Victor, Jr.'s therapists, indicates Victor, Jr.'s suicidal ideation was attributable to his autism. To the contrary, as discussed, Victor, Jr. had been diagnosed with depression only after the parents' divorce; and Victor, Jr.'s therapist Richardson said the child was emotionally overwhelmed by the conflict between the

_____

[10] Victor ignores that he had previously described Kristopher and Frank, and had been working to have Kristopher diagnosed, as autistic.

28

parents.  There was substantial evidence it was Victor's extreme animosity toward Leticia and his impaired ability to manage his emotional responses and regulate his behavior that fueled the acrimonious nature of the parental confrontations, which in turn threw Victor, Jr. into emotional turmoil.

Victor's impaired capacity to moderate his emotional responses and behavior rendered him unable to adequately protect, and created a substantial risk of serious physical harm to, not only Victor, Jr. but also his three younger siblings.  All four children had observed and been upset by the parents' repeated verbal arguments.  Daisy was diagnosed with depression and saw a therapist once a week.  Although she never witnessed her parents hit or push each other, she heard them arguing, which she said was most of the time they talked to each other.  Daisy's statement she would just get annoyed when their parents fought was contradicted by other evidence—for example, Daisy's statement she wanted to "get my mental health good and trust him [Victor] again" before she would feel comfortable visiting him.  Daisy's troubled relationship with Victor was due to a history of concerning incidents that included the occasion when he showed Daisy and the two younger boys a gun, stating his intent to kill the maternal family with it and saying Daisy had to choose who to kill.[11]

---

[11]    In September 2019 the Department had become aware of the allegation that Victor, in the presence of the three youngest children, had shown Daisy a gun and told her he would use it to kill her mother's family, including her mother.  The Department's disposition of the claim at that time was that it was "inconclusive."  Victor asserted the allegation of his threatening people with a gun was false.  On June 25, 2020 Daisy provided the caseworker with her account of Victor's threat to kill the

Although Kristopher had initially denied ever witnessing the parents fighting or arguing, he later affirmed having seen them fight. Both Kristopher and Frank became scared and hid when the parents argued and said they were afraid of their father. They were seeing a therapist and working on processing their emotions.

Victor's argument Victor, Jr.'s siblings were not currently (at the time of the jurisdiction hearing) at risk of harm because they lived primarily with their mother is misplaced. The three younger children had continuing contact with their father. Most recently, during Victor's December 15, 2020 visit Victor had yelled at Daisy and caused her to become highly emotional and upset. Moreover, Victor ignores that Kristopher and Frank's then-current living situation was the result of the juvenile court's order detaining the children from their father's custody; Kristopher and Frank had previously been exchanged weekly under a 50/50 family law custody order. In sum, Victor fails to establish insufficient evidence supported the finding the children were still subject to a substantial risk of harm at the time of the jurisdiction hearing.[12]

---

maternal family, including telling the caseworker Victor had also told Daisy she had to choose who to kill. At the jurisdiction hearing, counsel for Daisy, Kristopher and Frank raised, without objection, Victor's threat to kill the maternal family. The juvenile court found the minors' counsel's arguments persuasive. Issues of credibility belong squarely with the juvenile court. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

[12] Because substantial evidence supports the jurisdiction finding as to Victor, Jr. under section 300, subdivision (b)(1), we decline to address Victor's argument there was insufficient evidence to support the jurisdiction finding as to the child under

## 2. *Victor's Challenge to the Disposition Orders Is Moot*

"'[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error.'" (*In re Rashad D.*, *supra*, 63 Cal.App.5th at p. 163; accord, *In re D.N.* (2020) 56 Cal.App.5th 741, 757 ["'[a]n appeal may become moot where subsequent events, including orders by the juvenile court, render it impossible for the reviewing court to grant effective relief'"]; see *In re J.P.* (2017) 14 Cal.App.5th 616, 623; *In re N.S.* (2016) 245 Cal.App.4th 53, 60.) Because the juvenile court has now terminated its jurisdiction and entered a custody order pursuant to section 362.4, we can provide Victor no effective relief from the challenged disposition orders. (See *In re S.P.* (2020) 53 Cal.App.5th 13, 16 ["[c]ourts do not decide issues that can provide no effective relief for the parties"].)

The removal orders made at the disposition hearing, necessarily temporary in nature, have been superseded by the custody order entered by the juvenile court on June 28, 2021, modifying the family law court's joint custody order by granting sole legal and physical custody of the children to Leticia. Similarly, the visitation orders made earlier in the proceedings have been replaced by the order for monitored visitation included with the termination and custody orders. Victor has an

---

section 300, subdivision (c). (*In re I.J.*, *supra*, 56 Cal.4th at p. 773 ["'[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence'"].)

opportunity to challenge those matters in his appeal from the custody order, which remains pending in this court.  The other aspects of the disposition order, including the requirement that Victor drug test and participate in programs and services, were terminated when the juvenile court terminated its jurisdiction.

## DISPOSITION

The juvenile court's jurisdiction findings are affirmed.  The appeal from the disposition order is dismissed as moot.


PERLUSS, P. J.


We concur:


SEGAL, J.


FEUER, J.